David B. Owens (SBN 275030)
LOEVY & LOEVY
333 S. Grand, Suite 3310
Los Angeles, CA 90071

Jon Loevy, IL Bar: 6218254*
Isaac Green, IL Bar No. 6350515*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

*Counsel for Plaintiff*

*Pro hac vice admission forthcoming

## UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL SOLORIO,<br><br>            Plaintiff,<br><br>      v.<br><br>COUNTY OF LOS ANGELES, DAN MCELDERRY #218049, KENNETH GALLATIN #031310, ROBERT CARR, JEFFREY GRANT #115735, MARK SHAUGHNESSY #232689, MICHAEL GALVAN #297028, MARK BREWSTER #279549, IRMA TORRES #413224, J. MCGUFFIN #275813, PAUL DRAKE #207138, RAY PEAVY, JAMES VANDEPAS, KEVIN C. LLOYD #201706, S. ROSTOMIAN #283290, and UNIDENTIFIED EMPLOYEES of the COUNTY OF LOS ANGELES<br><br>            Defendants. | Case No.<br><br><br>**COMPLAINT FOR DAMAGES & OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

1

Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1367, Plaintiff MIGUEL SOLORIO, by his undersigned attorneys, complains against Defendants COUNTY OF LOS ANGELES, DAN MCELDERRY, KENNETH GALATIN, ROBERT CARR, JEFFREY GRANT, MICHAEL GALVAN, MARK BREWSTER, IRMA TORRES, J. MCGUFFIN, RAY PEAVY, PAUL DRAKE, KEVIN C. LLOYD, JAMES VANDEPAS, S. ROSTOMIAN, and UNIDENTIFIED EMPLOYEES of the COUNTY OF LOS ANGELES and states:

## INTRODUCTION

1.      In December of 1998 Plaintiff Miguel Solorio ("Plaintiff" or "Solorio") had recently graduated high school, was working full time, and attending college.

2.      Still a teenager, Solorio's life was derailed when Los Angeles Sheriff's Department ("LASD") officers, named as Defendants in this case ("Officer Defendants"), committed misconduct that led to his wrongful conviction for the murder of Mary Ann Bramlett.

3.      Plaintiff spent the nearly twenty-five years incarcerated for a murder he did not commit. He is completely innocent of this crime.

4.      The Officer Defendants nevertheless framed Solorio by fabricating eyewitness identifications and other evidence, including coercing witnesses to support their concocted case against Solorio, and by suppressing favorable information that would have shown his innocence.

5.      The Officer Defendants acted pursuant to the unconstitutional policies and practices of the County of Los Angeles and the Los Angeles Sheriff's Department.

6.      Solorio will never regain the foundational years of his life stolen from him on account of Defendants' misconduct. Through this lawsuit, Solorio seeks justice and redress for the terrible harm the Defendants' actions have caused.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Solorio's rights secured by the United States Constitution.

8.      This court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is proper, as the events giving rise to these claims occurred within this District. 28 U.S.C. § 1391(b).

## THE PARTIES

9.      Plaintiff Miguel Solorio is a 46-year-old man who lives in the greater Los Angeles area. Since his exoneration and release, Solorio has dedicated himself to trying to help others who have been wrongfully convicted and to raise awareness to the scourge of wrongful conviction.

10.      At all relevant times, Defendants Dan McElderry, Kenneth Galatin, Robert Carr, Jeffrey Grant, Michael Galvan, Mark Brewster, Irma Torres, J. McGuffin, Ray Peavy, Paul Drake, Kevin C. Lloyd, James Vandepas, S. Rostomian, and Unidentified Employees of the Los Angeles Sheriff's Department were law enforcement officers employed by the Los Angeles Sheriff's Department ("Officer Defendants").

11.      Each Officer Defendant acted under color of law and within the scope of their employment at all times relevant to this lawsuit. All are sued in their individual capacities.

12.      At all times relevant to the events described in this complaint,

Defendants Peavy, Drake, Gallatin, Vandepas, and other unknown defendants were officers and supervisors in the LASD ("Supervising Defendants") responsible for investigating and overseeing the Bramlett murder investigation, and in that capacity, they conducted, directed, reviewed, approved, and ratified decisions of the other Officer Defendants, along with engaging in investigative activities themselves.

13.     The County of Los Angeles is a California municipal entity that operates the Los Angeles Sheriff's Department (LASD). The LASD is or was the employer of each individually-named Defendant and the other Unidentified Officers. The County is liable for all torts committed by the Officer Defendants pursuant to California law. The County is also responsible for indemnifying judgments against the Officer Defendants. Finally, the County is responsible for the policies, practices, and customs that caused Solorio's wrongful conviction. The Supervising Defendants had final policymaking authority for the policies and customs of the LASD.

## FACTS

### The Shooting of Mary Ann Bramlett

14.     On December 6, 1998, around 11:00 pm, 82-year old Mary Ann Bramlett was shot while in her car at the intersection of Washington and Pioneer in Whittier, California.

15.     Police believed the drive-by shooting of Bramlett was gang-related.

16.     Shortly before the shooting, the shooter's car was parked under a highway overpass just west of Pioneer.

17.     Investigators believed that shortly before the shooting the shooter's

4

car was parked under a highway overpass just west of Pioneer, a second car ("the target car") pulled up next to the shooter's car, words were exchanged, and someone in the shooter car flashed a gun.

18.     The occupants in the target car screamed and ducked down, and the driver of the target car drove off with the shooter car chasing behind.

19.     The target car ran a red light at the intersection of Washington and Pioneer passing Bramlett and her two passengers, who were waiting for the light.

20.     The shooter car arrived at the intersection and shots were fired into Bramlett's car.

21.     Bramlett was shot in the head and died four days later.

### Miguel Solorio Had Nothing To Do With Bramlett's Murder

22.     Solorio was not involved in the Bramlett murder.

23.     In December 1998, Solorio was employed, attending college and building his adult life.

24.     Solorio could not have committed the murder because he was with his then-girlfriend and other family members the night of the crime.

### Rather than Conduct an Honest Investigation, Defendants Fabricated Evidence of Solorio's Involvement

25.     The LASD was dispatched to investigate the shooting. Officer Defendant Brewster and his partner arrived first.

26.     Defendant Brewster had previously interacted with Solorio and was looking for a reason to arrest him.

27.     Defendant Brewster interviewed the two passengers riding in Bramlett's car, Lucile Thompson and Ellis Butcher.

28.     According to Defendants, Thompson could not describe the

5

perpetrator or the shooter car.

29.    According to Defendants, Butcher described the shooters' car as a "full size tan four door 1993 or 1994 vehicle."

30.    Defendant Detective Grant was assigned to be the lead investigator, was assisted by Defendants Lloyd, Shaughnessy, Rostomian, Brewster, and Leyva, and was supervised by Defendant Sargeant Drake and Lieutenant Vandepas.

31.    Over the first few days of investigating, the Officer Defendants did not identify any leads or meaningfully investigate the shooting.

32.    With no leads, Officer Defendants claim two officers, Defendants Torres and McGuffin, were allegedly "flagged down" by a man named Martin Leiva while driving in their squad car.

33.    According to Defendants, Leiva claimed he had seen reports about the Bramlett shooting on the news, and realized he and his passengers were the intended targets.

34.    Defendants Torres and McGuffin took Leiva to a LASD station.

35.    According to Defendants, Leiva described the shooters' car as a "late model, 4 door, tan or brown vehicle."

36.    According to Defendants, Leiva also claimed that the driver said he was "Clever from Quiet Village" and then flashed a .38 revolver.

37.    Leiva did not initially state that the driver of the shooter car identified himself as "Clever." That detail came from the Officer Defendants.

38.    The Officer Defendants set out to interview the other people Leiva claimed were in his car at the time of the shooting.

39.    When they did so, none of the passengers said the driver introduced

himself as "Clever."

40.     Leiva now admits the driver did not say his name was "Clever."

41.     The Officer Defendants, including McElderry, pressured Leiva for years to falsely claim that the driver introduced himself as Clever.

### The Tainted Identification Procedure

42.     Falsely pointing to "Clever" was a pretext for implicating Solorio in the crime, as Defendants believed this was Solorio's nickname.

43.     The Officer Defendants, led by Defendant Grant, assembled a six-pack photo lineup and included a picture of Solorio therein.

44.     The Officer Defendants showed this lineup first to Leiva and then to one of the women who claimed to be in Leiva's car on the evening of the shooting, referred to (albeit incorrectly) as Angelica Martinez.

45.     Before the lineup, Leiva and Martinez both informed the Officer Defendants that they were certain they could identify the driver of the car.

46.     Leiva did not select Solorio's picture from the lineup.

47.     Martinez did not select Solorio's picture from the lineup.

48.     Leiva and Martinez both picked the same, filler photograph.

49.     Leiva left the station.

50.     Officer Defendants created a second photo lineup with a different picture of Solorio.

51.     Solorio was the only person whose photo appeared in both the first and second lineups.

52.     The Officer Defendants switched out the picture and used a picture of Solorio they believed looked more like the photograph Martinez and Leiva both

selected in the first lineup.

53.     Established police practices at the time recognized the importance of giving witnesses specific cautionary instructions before administering an identification procedure.

54.     Officer Defendants did not provide such admonishments to Martinez.

55.     Instead, Officer Defendants showed Martinez the second photo lineup, and suggestively directed her attention to Solorio.

56.     This time, Martinez misidentified Solorio as the driver.

57.     It was contrary to established policing practices, and gratuitously suggestive, to show Martinez a second lineup containing a different photo of Solorio only moments after she did not select him in the first lineup.

58.     Officer Defendants showed two other passengers from Leiva's car the second lineup.

59.     Neither identified Solorio.

60.     Officer Defendants failed to preserve and produce the physical descriptions of the driver and passenger in the shooter vehicle that Leiva, Martinez, and other witnesses gave them prior to being shown the lineup photos.

61.     This evidence was material and exculpatory given the inconsistent explanation these witnesses offered for their failures to identify Solorio when they were first shown his photo in a lineup.

62.     Rather than investigating other suspects after these witnesses all failed to initially identify Solorio as the shooter, Officer Defendants went all in on manufacturing a case to convict Solorio despite facts learned in the investigation showing he was not involved in the shooting.

**Defendants Arrest Solorio But Are Forced To Let Him Go Given No Reliable Evidence Connected Him To Bramlett's Shooting**

63.     Officer Defendants, including Defendants Grant, Shaughnessy, Rostomian, and Leyva, sought and secured search warrants for Solorio's home.

64.     The Officer Defendants also obtained a search warrant of a four-door sedan belonging to two brothers, Rafael and Edgar Solorzano, claiming it matched the description of the shooter's vehicle.

65.     Searches were made of Solorio's home and the Solorzanos' car. No evidence connected to the shooting was found during the searches.

66.     The Officer Defendants nonetheless sought and obtained Solorio's arrest by invoking Martinez's misidentification, even though they knew it was tainted and unreliable.

67.     Before Solorio was even arrested, Officer Defendants spoke to several witnesses who confirmed Solorio could not have committed the crime because his location during the entire night of the murder was accounted for.

68.     On information and belief, the Officer Defendants made contemporaneous records of their conversations confirming Solorio could not have possibly committed the crime.

69.     The Officer Defendants did not turn over these records to the prosecutors.

70.     Officer Defendants secretly recorded a conversation between Solorio and Edgar Solorzano in which Solorio truthfully denied his involvement and confirmed he could not have committed the crime because he was elsewhere.

71.     Officer Defendants secretly recorded a separate conversation, not involving Solorio, in which an alternative suspect made a number of statements

implicating himself in the shooting, including by correctly identifying the type of gun used in the crime.

72.     The Officer Defendants did not disclose to the prosecutor or criminal defense attorneys the exculpatory details of these surreptitiously recorded conversations in any report, and they suppressed the existence of the second recording in which an alternative suspect implicated himself in Bramlett's murder.

73.     Despite evidence of Solorio's innocence and evidence strongly implicating another person, Officer Defendants informed the local news media that Solorio was the primary suspect in Bramlett's shooting.

74.     Solorio's picture was published in the news as the primary suspect in the shooting.

75.     However, because there was no actual evidence to charge Solorio with the crime, Officer Defendants were forced to release him.

**Officer Defendants Double Down and Fabricate and Suppress More Evidence**

76.     The investigation of the Bramlett murder was transferred to deputies in the LASD Homicide Bureau, including Defendant Detectives McElderry and Carr, their sergeant, Defendant Gallatin, and their lieutenant, Defendant Ray Peavy (the Homicide Defendants).

77.     The Homicide Defendants sought to reinterview Solorio, who had been released and could have refused the conversation.

78.     However, Solorio agreed to speak with the detectives and, again, truthfully explained his whereabouts on the night of the shooting.

79.     The Homicide Defendants threatened Solorio that if he did not give them information regarding the actual perpetrators, they would prosecute Solorio

for the murder.

80.     The Homicide Defendants reinterviewed the people who had been previously interviewed, and who had not provided information pointing to Solorio. The Homicide Defendants claim that these witnesses switched courses and provided evidence inculpating Solorio.

81.     For instance, contrary the truth, the Homicide Defendants claimed Martinez had heard the driver introduce himself as "Clever" before flashing a gun.

82.     Homicide Defendants reported that Martinez was 100% positive of her (mis)identification of Solorio because, they claimed that she stated that she was very familiar with him.

83.     That was false. Martinez did not say this.

84.     Likewise, Homicide Defendants falsely claimed that when they spoke to another teenage witness who was purportedly in the target car, she also remembered the driver saying his name was "Clever" and that, despite not being able to make an identification in the lineup she was shown and despite previously stating that she did not get a clear view of the driver, she was now certain that she saw the driver in a newspaper article concerning the shooting.

85.     This was also false.

86.     The Homicide Defendants and possibly other Defendants interviewed Richard Casillas, another claimed teenage passenger in Leiva's car during the shooting.

87.     The Homicide Defendants claim Casillas studied the second photo lineup Defendant Grant had created for several minutes before selecting Solorio's photo and definitively identified him as the driver of the shooter car.

11

88.     In reality, Defendants knew that Casillas did not study the lineup. He simply circled and signed the paper where the Defendants told him to.

89.     The Homicide Defendants interviewed the final passenger in Leiva's car, Kelly Espinoza. She truthfully told the officers she knew Solorio, would have recognized him, and that he was not the driver of the shooter car.

90.     At least one Officer Defendant threatened Espinoza that she would be punished if she testified at trial that Solorio was not the driver of the shooter car.

91.     The Defendants did not create any record of and deliberately suppressed Espinoza's exculpatory statement as well as their threats.

92.     The Officer Defendants fabricated other evidence tying Solorio to the shooter car. On information and belief, after learning the Solorzano's four-door car could not have been involved, the Officer Defendants showed Martinez a picture of a different two-door Mercury and pressured her to identify it as the shooter car.

93.     The Officer Defendants falsely reported that Martinez provided a more detailed, revised description of the shooter vehicle matching this Mercury.

94.     The Officer Defendants also wrote reports stating that this vehicle was registered to Plaintiff, a claim they knew was false.

95.     The Officer Defendants also fabricated evidence suggesting Solorio hid the Mercury and re-registered it to a different address after the shooting.

96.     These claims were false. Throughout the investigation, the Mercury was located at its registered address and Solorio did not move it.

97.     The Officer Defendants also suppressed witness statements including from other LASD deputies that Solorio had never been seen driving the Mercury.

98.     The Officer Defendants also suppressed other exculpatory statements

made by witnesses.

99.     In December 1998, the Homicide Defendants submitted the case for indictment to the district attorney's office, but they were told that they needed to gather more evidence, including a murder weapon tied to Solorio, before charges would be approved.

100.     So, the Homicide Defendants continued pressuring witnesses to inculpate Solorio.

101.     To that end, Defendant McElderry and other Officer Defendants re–re–interviewed Leiva in January, a month after the shooting, after Leiva had failed to identify Solorio in the first photo lineup, and after Solorio's face had been all over the news in connection with the shooting.

102.     Defendant McElderry and other Officer Defendants showed Leiva the second photo lineup, despite knowing that any identification by Leiva would be unreliable and that showing Leiva a second lineup containing a picture of Solorio was contrary to established policing procedures (though not contrary to typical practices among LASD deputies).

103.     Defendant McElderry and other Officer Defendants reported Leiva selected Solorio's picture from the lineup and expressed certainty that Solorio was the driver of the shooter car.

104.     Defendant McElderry showed Leiva photographs of the Mercury, falsely suggested it belonged to Solorio, and asked Levia to indicate the Mercury was the shooter car (though it was not).

105.     McElderry then falsely reported that Leiva positively identified the Mercury as the one he had seen on the night of the shooting despite previously

describing a very different looking vehicle.

106.     Separately, Defendants Shaughnessy, Galvan, and other Officer Defendants arrested suspected gang members and recovered two guns, including a .357 revolver that an LASD ballistics officer reported was used to kill Bramlett.

107.     The Officer Defendants, including McElderry and Carr, interviewed one of the suspected gang members, who was a juvenile and among those arrested with the revolver.

108.     The Officer Defendants threatened him with felony charges and pressured him to connect the revolver to Solorio.

109.     Eventually he relented and made a false statement—fabricated by Defendants—claiming he had seen Solorio with the revolver and that Solorio had given it to someone else as the police arrived.

110.     The Officer Defendants suppressed the fact that they fabricated evidence purporting to link Solorio to the revolver.

**Criminal Proceedings**

111.     The Officer Defendants wrote reports during their investigation. Those reports include statements that are false, as described above. Those reports include material omissions that make them misleading and that exclude favorable and exculpatory information.

112.     With inculpatory evidence made-up, and exculpatory evidence hidden, Defendants sought and obtained criminal charges against Solorio for the Bramlett murder.

113.     There was never probable cause for the Officer Defendants to believe that Solorio was involved in Bramlett's murder in any way.

114.    Instead, any assertion of probable cause was made on the basis of Defendants' unreliable, fabricated evidence and with Defendants having failed to disclose favorable evidence pointing away from Solorio.

115.    Following a jury trial, Solorio was wrongfully convicted on all counts.

116.    Solorio's conviction was obtained on the basis of evidence the Officer Defendants fabricated including the false identifications, the false reports regarding the registration and movement of the purported murder vehicle, and the coerced statement tying Solorio to the murder weapon.

117.    Additionally, Solorio was denied due process because the Officer Defendants hid and lied about exculpatory evidence, including numerous contemporaneous and credible exculpatory statements made by and about Solorio.

118.    Solorio was sentenced to life without the possibility of parole.

**Solorio's Wrongful Conviction is Vacated and he is Found Factually Innocent**

119.    In November of 2023, Solorio's conviction was vacated.

120.    He walked out of prison a free man, having spent more than 24 years in prison for a murder he did not commit.

121.    In December 2023, following a joint motion from Solorio and the Los Angeles County District Attorney's Office, the charges were dismissed and Solorio was found factually innocent of Bramlett's murder by the Superior Court of California, Los Angeles County.

**The Policies and Practices of the LASD Caused Solorio's Conviction**

122.    During the times relevant to Solorio's claims, the LASD condoned and cultivated a culture of impunity which caused Solorio's wrongful conviction.

123.    The LASD condoned and tolerated gangs of Sheriff's deputies that

organized outside of the agency's hierarchy to reward members and exercise power over non-members. This tolerance communicated to the Officer Defendants— including those not in deputy gangs—that the LASD had intentionally abandoned its responsibility of supervising deputies.

124.    Sheriff's deputies were exposed to deputy gangs from the start of their careers. Every new Sheriff's deputy's first assignment is serving as a guard in one of the County's jails.

125.    Sheriff's deputies at the jails are organized into gangs, including the "2000 Boys," the "3000 Boys," the "Pirates," the "Rattlesnakes," the "Vikings," the "Banditos," the "Executioners," and the "Posse." Deputies join the gangs by committing brutal violence against prisoners at the jail.

126.    These deputy gangs and other deputy gangs throughout the LASD ("Department"), exercise independent control over the areas in which they work, above and apart from their nominal supervisors. Thus, deputies in their first jail assignments quickly learn that the Department has abdicated its own responsibility for supervising and disciplining deputies and has delegated such responsibility to deputy gangs.

127.    Sheriff Sherman Block, who was Sheriff from 1982 to 1998, condoned the LASD's deputy gangs. He once told a reporter, "Flashing a sign? That's meaningless. In fact, I'm sure the gang members out there get a kick out of deputies flashing a sign, having their own gang." Employees of the Department, including the Officer Defendants, understood that Block condoned deputy gangs.

128.    Deputy gangs initiated new members by requiring them to commit acts of brutality or excessive force. The gangs took the attitude that excessive force

against residents was necessary to control crime. Their members believed that constitutional rights were less important than being tough with perceived criminals. The LASD endorsed and tolerated these gangs and allowed them to operate. That tolerance signaled to officers, including Officer Defendants, that getting convictions and being aggressive and tough was more important than respecting residents' constitutional rights.

129.    Deputy gangs were also rampant at stations across Los Angeles County. For example, new trainees at the Lynwood Station were given Viking pins on the first day of patrol training. At the end of their training periods, the Vikings deputy gang initiated select deputies through an initiation process that involved tattooing them with the gang's symbol.

130.    Deputy members of the Vikings gang engaged in egregious misconduct, including retaliating against supervisors whom they perceived as enemies.

131.    In January 1991, Paul Tanaka was promoted to lieutenant, despite being an active member of the Vikings gang. Tanaka would later assume an executive position in the Department and contributed to the Department's failure to monitor, discipline, and prevent deputy gangs. The Officer Defendants understood that deputy gang members received promotions and that the LASD's policy was that deputy gang membership was not a disqualification for promotion within the LASD.

132.    In October 1991, United States District Judge Terry J. Hatter Jr. found that a "neo-Nazi, white supremacist gang" of deputies existed within the LASD and that "policy makers" in the department "tacitly authorize deputies'

unconstitutional behavior."

133. Following the revelation of widespread deputy gang activity, racist deputy actions, and other deputy misconduct, Special Counsel James G. Kolts wrote and published a report in 1992 on misconduct issues across the Department. The report revealed—and put the Department on notice—that deputy gangs were widespread and responsible for violations of residents' rights.

134. The Vikings remained an active deputy gang even after the Kolts Report called for the Sheriff to investigate, monitor, and discipline such gangs. In May 1995, deputies passed out Viking pins to be worn at a deputy's funeral.

135. After the Lynwood station was closed in 1994 in the wake of Judge Hatter's exposing the impunity with which LASD deputies in the Vikings gang operated out of the station, the LASD reassigned Viking deputies to other stations throughout the agency, including the Pico Rivera station.

136. The Regulators were another active deputy gang. The Regulators shook down deputies to raise money for deputies who received suspensions via the LASD's disciplinary processes. The effect was to counteract whatever disciplinary impact might have come from suspensions for misconduct.

137. The Regulators were committed to an intensive code of silence no different from that observed among criminal gangs; under oath, one Regulator refused to discuss how the gang made decisions because such information was not publicly known.

138. Indeed, Regulator deputies refused to talk with the Department's investigators regarding the gang's activities. The gang took over a Sheriff's station and refused to respect the orders of superior officers. The Department tolerated and

condoned the activities of the Regulators and other gangs.

139.    In 1998, when Baca became Sheriff, he knew that many deputy gangs operated across the Department and that the LASD had decided to allow deputy gangs to operate.

140.    The Sheriff and his delegees knew that it was important to exercise control over deputies to ensure that they respected residents' constitutional rights and obeyed the law. They received internal and external notice of the prevalence of deputy gangs, and knew that deputy gang members shared a philosophy of using excessive force and violating residents' rights to try to "get tough" and secure convictions. However, the LASD made an intentional choice to allow those gangs to operate by not acknowledging their existence, allowing membership in such gangs, and choosing not to monitor or track deputy gang membership.

141.    After Lee Baca became Sheriff in 1998, he decided to allow deputy gangs to continue to operate within the LASD. Baca knew, through his own experiences and through media reports and coverage, that Sheriff's deputies had organized gangs and had taken control over certain stations within LASD. The Officer Defendants knew that Baca had not taken action against deputy gangs and understood that the Department would not discipline them for the same illegal activities engaged in by those gangs, including fabricating evidence, suppressing evidence, and using unconstitutional threats.

142.    At the time of Solorio's arrest, Sheriff Lee Baca had been running the Sheriff's Department for two years.

143.    During his tenure, Baca systematically covered up misconduct within the Department and shielded its employees from public accountability.

144.    In response to an FBI investigation of abuses committed by Sheriff's deputies, Baca hid a prisoner-informant within the County's jail system from FBI investigators. Baca also allowed two Sheriff's sergeants to threaten the lead FBI agent investigating deputy abuse.

145.    Deputies at the Pico Rivera station and in the LSAD Homicide Bureau were involved deputy gangs. The Officer Defendants knew that the Department condoned deputy gangs in those organizations. The LASD's policy was that closing cases and "getting tough" with residents was more important than exercising control over deputies or preventing constitutional violations, as communicated by its decision to allow these deputy gangs to operate.

146.    Despite widespread flaunting of supervisory authority and organized acts of resistance and intimidation by deputy gang members against supervisors, the Department allowed deputy gangs to continue to operate. The LASD chose not to ban membership in deputy gangs and chose to ignore evidence of deputies' membership in those gangs.

147.    The LASD chose a policy of plausible deniability—allowing commanders and other supervisors to ignore the deputy gangs operating under their supervision—instead of requiring its commanders to know the specific problems in place at the stations under their supervision, whether deputy gangs were active at each station and the influence exerted by those gangs, and what kinds of misconduct were committed by gangs at those stations.

148.    By 1998, the Department's policy of allowing deputies to self-organize in deputy gangs had taken full effect and was known to the Officer Defendants. Deputy gang members had risen to leadership positions within the

Department and condoned the gangs.

149.     Despite lacking any evidence that the Department's deputy gang problem had been resolved, Los Angeles County and the LASD failed to monitor or investigate the persistence of deputy gangs within the Department.

150.     The LASD and the County of Los Angeles had a policy and practice of fabricating and suppressing evidence from criminal suspects, and of tolerating and allowing such actions by its deputies. The Officer Defendants fabricated and suppressed evidence in the Bramlett murder investigation pursuant to that policy and practice.

151.     Examples of these practices include:

    a.   In October 1989, Sheriff's deputies Elizabeth Smith and Anthony Campbell beat Demetrio Carrillo after he spoke briefly with a woman who was being cited by a deputy sheriff. The deputies then arrested Carrillo without justification and prepared false reports against him to justify his arrest.

    b.   In February 1990, multiple Sheriff's deputies were charged with federal crimes in connection with the theft of more than a million dollars during drug raids. Numerous deputies were eventually convicted on corruption charges.

    c.   Testimony at those deputies' trials revealed that deputies at the Lennox Station beat suspects, stole money, and framed suspects by pilfering cocaine from the Department's evidence storage and planting it in homes and vehicles.

d. Deputies involved in the 1990 corruption scandal also lied in search warrant affidavits and filed false police reports. Nearly two dozen criminal cases were dismissed, plea-bargained, or reviewed because of the scandal.

e. In February 1990, deputies dragged Jose Ortega from his friend's porch and struck him in the back with a metal flashlight without necessity or justification. They left him without arresting him, but later returned to take him to the hospital. At the hospital, the deputies arrested him and filed false and misleading police reports which included false statements and material omissions.

f. In March 1990, deputies submitted knowingly false affidavits to obtain search warrants on several residences in the City of Lynwood. They entered these residents' homes, terrorized and humiliated them at gunpoint, and ransacked their houses. Using the threat of violence, they detained and interrogated the residents in an effort to coerce confessions from them.

g. In April 1990, deputies fabricated inculpatory evidence and suppressed exculpatory evidence regarding Thomas Rosas. To cover up their gratuitous violence, they falsely alleged that Rosas drank an alcoholic beverage on a public street, was verbally abusive towards officers, struck or tried to strike officers, or attempted to resist arrest. They also omitted from their reports that deputies tasered Rosas twice for no reason and used unreasonable and unnecessary force against Rosas.

h. In May 1990, deputies falsely stated verbally, then falsely wrote, that resident Tracy Batts was armed with a handgun. They created this false narrative to justify their gratuitous shooting and killing of an unarmed man.

i. In May 1990, deputy Paul Archambault falsely claimed that Elzie Coleman had brandished a handgun. After shooting and killing Coleman, Archambault fabricated evidence and wrote a false police report to justify the killing. Deputies removed witnesses from the scene of the shooting, falsely arrested eyewitnesses to cover up the true facts of the shooting, and presented false evidence and testimony at trial.

j. In 1991, the Department's deputies suppressed evidence regarding their killings of residents: for example, describing an object held by a man they shot and killed as a "rifle-like" object when it in fact was a wooden club and describing another man they killed as pointing a revolver at them when he in fact dropped his weapon before a deputy shot and killed him.

k. Between 1991 and 2011, the Department suppressed evidence of Francisco Carrillo's wrongful conviction. Deputy Craig Ditsch used an unduly suggestive identification procedure, telling a key eyewitness that Mr. Carrillo committed the crime and then suppressing evidence of his improper procedure. Ditsch further suppressed that information and falsely represented in his report that the witness had independently identified Mr. Carrillo. Ditsch

23

conspired with other deputies to use a photo "six pack" created in another case (which also involved false eyewitness evidence) to influence the eyewitness to falsely identify Mr. Carrillo. Even after Mr. Carrillo was wrongfully convicted of murder, Ditsch and other Sheriff's deputies conspired to hide evidence of their wrongdoing.

l.  Between 1985 and 2012, the Department suppressed evidence of Frank O'Connell's wrongful conviction. Sheriff's detectives failed to disclose evidence pointing to another suspect and improperly influenced witnesses. Specifically, detectives used unduly suggestive identification procedures to pressure a key witness to identify O'Connell; detectives intimidated that same witness into making a false identification; and detectives failed to turn over notes indicating that another person who matched a description of the suspect had tried to kill the victim years prior. The detectives continued in a conspiracy to hide evidence of this wrongful conviction during this time.

m.  Around 1995, deputies fabricated and suppressed evidence related to an unlawful police shooting. The deputies claimed that the suspect pivoted and pointed a gun at them. However, the suspect was shot in the back, demonstrating that he had not turned to fire at the deputies. And the suspect's supposed gun was found 37 feet away from where the suspect fell, but deputies shot the suspect in his spinal cord and inflicted an injury that would have prevented him from running 37 feet after being shot. The deputies' account of the shooting was obviously false. Still, the deputies suppressed the true facts of the

shooting. The Department's internal investigation was so inadequate and flawed that it did not even mention that the suspect was shot from behind.

n.  In March 1999, David Auner suppressed evidence showing that witnesses to a shooting had been improperly admonished. Auner failed to give the appropriate admonishment to three eyewitnesses, then falsified a report claiming that he had appropriately admonished them.

152.    The LASD also maintained a practice of hiding exculpatory evidence in "Poor Boy" investigative files that were hidden from prosecutors and criminal defendants, allowing homicide detectives to withhold identification procedures, evidence of alternate suspects, and other exculpatory evidence from criminal defendants.

153.    LASD deputies, including the Officer Defendants, knew that the Department did not oppose the suppression of exculpatory evidence or the fabrication of evidence. The Officer Defendants in this case acted in accordance with those policies and practices to convict Solorio of a murder that he did not commit.

154.    The LASD and the County of Los Angeles had a policy and practice of training officers to commit misconduct and to seek convictions at all costs, including the violation of residents' rights.

155.    The Department knew that field training officers assigned to train and mentor new patrol deputies often committed misconduct and encouraged deputies to commit misconduct. It allowed deputies to be trained in improper and

unconstitutional policing, consistent with its policy that being tough with residents and securing convictions was more important than respecting their constitutional rights.

156.    The Department also allowed deputy gangs to influence and control the assignment of field training officers.

157.    In April 1994, an independent monitor recommended that the LASD provide for centralized selection of field training officers and set specific criteria for removal of current field training officers, and automatic disqualification of field training officer applicants, for dishonesty or excessive force. The LASD instead chose to allow deputies who had committed excessive force or who had been found dishonest to serve as field training officers and continued to emphasize convictions and aggressiveness over constitutional rights.

158.    In 1996, a field training officer pled no contest to criminal charges after being accused by his trainee of planting false evidence and destroying evidence with the purpose of harassing Black and Latino residents. The trainee whistleblower faced violence and threats from deputy gang members and left the Department for her safety and the safety of her family. However, the Department never monitored and rooted out the deputy gang members responsible for this retaliation.

159.    Deputies were routinely trained to use excessive force, to discriminate against minorities, and to hold to a code of silence by the corrupt and gang-affiliated training officers employed by the Department.

160.    The Officer Defendants received this misguided training and their actions leading to Solorio's wrongful conviction were pursuant to such training.

161.    The Officer Defendants recognized that the LASD would not discipline them for misconduct or would administer only minimal discipline even for serious misconduct. Further, LASD's policy was to cover up misconduct and to shield both its employees and itself as a municipal entity from scrutiny and oversight.

162.    For example, the Department routinely covered up misconduct committed by its deputies by failing to accurately categorize it. It frequently designated excessive force by its deputies as "discourtesy" or "improper tactics," even for allegations of extreme force like being struck twice in the stomach or being struck repeatedly with flashlights and batons.

163.    Sheriff's supervisors also protected deputies from discipline and monitoring by "counseling" residents who came to the station to make complaints and trying to convince residents not to file complaints. Supervisors routinely failed to document such complaints. The LASD encouraged such actions because it did not want to be subject to scrutiny and oversight.

164.    Although the Department employed investigators to investigate deputy misconduct, those investigators routinely participated in cover-ups of misconduct. For example, when deputies responded to investigations with legal justifications instead of factual accounts, investigators made no effort to determine what actually happened.

165.    Department employees routinely submitted incomplete use of force packages to cover up deputy misconduct. For example, they routinely failed to videotape or photograph injuries alleged in use of force incidents, failed to interview the complainant and witnesses to police uses of force, and omitted

27

important suspect and witness statements (such as allegations of racial slurs and verbal abuse by deputies).

166.    Even when deputies committed serious misconduct that endangered the life and constitutional rights of suspects, the Department responded with minimal and ineffective punishment.

167.    Examples of LASD's ineffective discipline of serious deputy misconduct include:

    a.  Around 1995, the Department gave a suspension of just four days to a deputy who pepper-sprayed an unconscious, intoxicated man four times, causing such severe chemical injuries that he had to go to the hospital. It gave a two-day suspension to a deputy who beat and abused a disabled fourteen-year-old boy without any justification. And it suspended for just two days a deputy who tried to tase a woman who had doused herself in gasoline; aware that he could have caused her to burst into flames, the deputy explained that he had tried to aim for a "dry spot."

    b.  In 1993, a sheriff's deputy severely beat a Black man who had tried to sell him a car radio, referring to him as a "n-----" and saying that he "hated n------." Despite the excessive force and outrageous racism of the deputy's actions, the Department gave him only a light punishment, communicating to deputies—including the Officer Defendants—that it would not punish officers who used excessive force with residents while ignoring their rights.

c. In 1995, an LASD sergeant assembled a seven-man team armed with flashlights, mace, and a taser to extract a prisoner from his cell for the sole purpose of administering a blood pressure test, ostensibly for the prisoner's health and benefit. The deputies beat the prisoner badly enough to break his jaw, requiring surgery. The sergeant's captain refused to discipline him and exonerated the sergeant, agreeing that the force used was "completely controlled, and minimal." The LASD endorsed this failure to discipline and allowed it to occur.

d. The Department also chose not to meaningfully discipline deputies for obvious lies. For example, around 1997, a deputy beat a tackled suspect with a flashlight on the back several times and kicked him twice during a daytime arrest. He was asked why he chose to carry his flashlight in broad daylight, and responded, "You never know if you will have to go under a house or somewhere where it is dark, or if it is still light." The Department rejected his explanation, meaning that it determined that he lied in the course of a misconduct investigation. But despite the combination of excessive force and intentional dishonesty, the Department suspended the deputy for only two days.

e. The Department similarly imposed only light discipline on supervisors even for egregious misconduct, suggesting to supervisors and patrol deputies alike that misconduct would not be seriously punished. Around 1997, a lieutenant grabbed a witness by the collar, lifted him off the ground, spoke angrily to him, and threw the resident down, having lost control of himself. The lieutenant did not document his

use of force and lied about his actions, denying using any force at all. He was defiant against his investigators and questioned why he was being investigated at all. He even instructed a subordinate not to mention his use of force in an official report. Despite his misconduct and dishonesty, the Department gave only a written reprimand to the lieutenant.

f. Around 1997, personnel in the Department's Region II were allowed to flout the rules requiring that every citizen's complaint be formally reported and documented. The Department's disciplinary processes were so lax that this deviation continued and Department personnel understood that the Department endorsed such deviations.

168. The Department ceded control of "fast" stations—stations with higher volumes of arrests and service calls—to aggressive deputies who organized into gangs to insulate themselves from discipline. Public reports regarding the Department noted that at such stations, deputies responded aggressively and with brutality to resistance or perceived disrespect from residents without serious interference by supervisors. The Department endorsed and allowed such conduct because it valued aggressive and "tough" behavior by its deputies above the constitutional rights of residents.

169. The Department ignored evidence of misconduct by its officers. Evidence of officer wrongdoing and dishonesty frequently surfaced during civil litigation against the Department. The Department failed to review and respond to such evidence.

170.    By June 2000, the Department discontinued its use of centralized risk management meetings and decreased its supervision of command-level staff and station-level misconduct. Consistent with its decision to endorse and allow deputy gangs and widespread police misconduct, the Department decreased its supervision of misconduct, communicating to deputies including the Officer Defendants that they need not fear discipline for misconduct.

171.    In 1999 and 2000, the Department tolerated and allowed the disproportionate use of lethal and non-lethal force at Century Station and throughout Region II generally. The Department chose not to investigate those trends in line with its hands-off approach to addressing known issues of misconduct and constitutional violations across the Department.

172.    Even by October 2001, the Department had not reversed its position of lax oversight. It continued to eschew risk management, accountability, control of the use of force, and the use of early warning and trend data. The Department consciously chose to ignore the many constitutional violations committed by its personnel.

173.    Solorio's wrongful conviction was caused because the Officer Defendants understood that they had free reign to violate his rights, pursuant to LASD's policy of shielding its deputies from meaningful supervision and discipline.

174.    The Department also chose to allow its officers to conduct unreliable and unduly suggestive eyewitness identification procedures because it valued securing convictions more than respecting residents' rights. As a result, residents were frequently prosecuted as a result of fundamentally flawed and corrupt

31

eyewitness identification procedures. The Officer Defendants conducted unduly suggestive identification procedures in accordance with these policies and practices.

175.    The Department chose to allow deputies to improperly influence eyewitnesses, including feeding information to those witnesses to skew their identifications so that the witnesses would identify the deputies' preferred suspects.

176.    The Department's practice was that deputies were not required to document the information provided to eyewitnesses during identification procedures and were not required to actually provide the admonishments written on lineup forms that deputies inconsistently asked witnesses to sign.

177.    The Department chose not to train its deputies to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the eyewitness was making an identification.

178.    The Department chose not to supervise deputies to require them to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the eyewitness was making an identification.

179.    As described above, deputies frequently coerced witnesses into making false identifications, manipulated witnesses' selection of suspects during identification procedures, and failed to reveal evidence impeaching eyewitness identifications.

180.    The Officer Defendants' unduly suggestive identification procedures in the Bramlett murder investigation were conducted pursuant to the LASD's practices and policies. The Officer Defendants knew that they need not fear discipline for improperly pressuring witnesses to make identifications or for

fabricating such identifications.

## Solorio's Profound Damages

181.    Solorio spent nearly 25 years incarcerated for crimes that he did not commit.

182.    Because of his wrongful conviction, Solorio experienced tremendous pain and suffering. He was unable to share holidays, births, and other life events with loved ones. He lost the opportunity to start a career and a family and now faces the tremendous challenge of picking up where he left off more than twenty-five years ago.

183.    Solorio suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above, all caused by the Officer Defendants' misconduct and the policies and practices of Defendants LASD and County of Los Angeles.

184.    During his incarceration Solorio became so depressed that he stopped speaking, eating and drinking and lost almost 40% of his bodyweight and was kept alive through court-ordered tube-feeding.

## COUNT I – 42 U.S.C. § 1983
### Fourteenth Amendment: Due Process, Fair Trial

185.     Each paragraph of this Complaint is incorporated as if restated fully herein.

186.     In the manner described more fully above, the Officer Defendants deliberately withheld exculpatory and impeachment evidence from Solorio, his attorneys, and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Solorio.

187.     In the manner described more fully above, the Officer Defendants fabricated false statements, including Leiva, Martinez, and Casillas' purported identifications of Solorio and inculpatory statements of witnesses, fabricated reports and other evidence falsely implicating Solorio in the murder of Bramlett, obtained Solorio's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Solorio during his criminal case.

188.     In addition, these Officer Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Solorio's purported connection to the murder, contained statements and described events that were fabricated and that Officer Defendants knew to be false. Officer Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false. Officer Defendants suppressed and withheld evidence of their wrongdoing.

189.     In the manner more fully described above, the Officer Defendants also procured supposed eyewitness identifications of Solorio by using unduly

suggestive identification techniques during photo lineups. Officer Defendants used the resulting false identifications to taint Solorio's criminal trial. The identification procedures were unnecessarily suggestive and resulted in unreliable identifications. The procedures were so conducive to irreparable mistaken identification that the identification's subsequent and foreseeable use in Solorio's criminal case violated due process of law. Some of what made these identification procedures unduly suggestive were not obvious on the face of the photo arrays included in the Defendants' case files and sent to the prosecutors.

190.    The Officer Defendants also suppressed evidence that demonstrated their knowledge of Solorio's innocence, including evidence indicating that other suspects committed the shooting, evidence that eyewitnesses were unable to identify Solorio as the shooter, and evidence supporting Solorio's true alibi.

191.    The Officer Defendants purposefully failed to collect, and in some cases, destroyed, exculpatory evidence indicating someone else committed the shooting and evidence that eyewitnesses were unable to identify Solorio as the shooter.

192.    In addition, based upon information and belief, Officer Defendants concealed, destroyed, and fabricated additional evidence that is not yet known to Solorio.

193.    The misconduct of all the Officer Defendants directly and foreseeably resulted in the unjust and wrongful criminal prosecution and conviction of Solorio and the deprivation of Solorio's liberty, thereby denying him his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Solorio would not and could not have

been pursued, and there is a reasonable probability that he would not have been prosecuted or convicted.

194.    The misconduct of all of the Officer Defendants also directly and foreseeably resulted in the Solorio's unjust criminal conviction, thereby denying him his constitutional right to due process, a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

195.    As a result of Officer Defendants' misconduct described in this Count, Solorio suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

196.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Solorio's constitutional rights.

197.    The misconduct by all of the Officer Defendants described in this Count was undertaken pursuant to and made possible by the policies and practices of the Defendants Los Angeles Sheriff's Department and County of Los Angeles, which Solorio was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

## COUNT II – 42 U.S.C. § 1983
## Fourth Amendment: Malicious Prosecution

198.    Each paragraph of this Complaint is incorporated as if restated fully herein.

199.    In the manner described more fully above, the Officer Defendants,

acting as investigators and supervisors, individually, jointly, and in conspiracy with each other, accused Solorio of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Solorio without any probable cause for doing so and in spite of the fact that they knew Solorio was innocent.

200.    The Officer Defendants accused Solorio of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

201.    The Officer Defendants made statements regarding Solorio's purported culpability knowing that those statements were false. They were aware that, as described more fully above, no true or reliable evidence implicated Solorio in the shooting.

202.    The Officer Defendants unreasonably seized Solorio without probable cause and deprived him of his liberty, in violation of his rights secured by the Fourth Amendment.

203.    The Officer Defendants deprived Solorio of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

204.    The Officer Defendants caused Solorio to be improperly subjected to judicial proceedings for which there was no probable cause.

205.    These judicial proceedings were instituted and continued by Officer Defendants maliciously, resulting in injury to Solorio.

206.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and/or reckless indifference to the rights of others.

207.    The prosecution terminated in Solorio's favor when, after his conviction was vacated, the State dismissed the charges against him and he was adjudicated innocent by the California Superior Court for Los Angeles County.

208.    As a result of Officer Defendants' misconduct described in this Count, Solorio suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

209.    The misconduct by all of the Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the Defendants Los Angeles Sheriff's Department and County of Los Angeles, which Solorio was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

## COUNT III – 42 U.S.C. § 1983
## Failure to Intervene

210.    Each paragraph of this Complaint is incorporated as if restated fully herein.

211.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Officer Defendants stood by without intervening to prevent the violation of Solorio's constitutional rights, even though they had the opportunity to do so.

212.    These Officer Defendants had a reasonable opportunity to prevent this harm but failed to do so.

213.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Solorio's

clearly established constitutional rights.

214.    As a result of the Officer Defendants' failure to intervene to prevent the violation of Solorio's constitutional rights, Solorio suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

215.    The misconduct by all of the Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the Defendants Los Angeles Sheriff's Department and County of Los Angeles, which Solorio was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

## COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

216.    Each paragraph of this Complaint is incorporated as if restated fully herein.

217.    After the murder of Mary Ann Bramlett, the Officer Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Solorio of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

218.    Additionally, before and after Solorio's conviction, the Officer Defendants further conspired to deprive Solorio of exculpatory information to which he was lawfully entitled.

219.    In this manner, the Officer Defendants, acting in concert with other

unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

220.    In furtherance of the conspiracy, the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above and each Officer Defendant was an otherwise willful participant in joint activity.

221.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Solorio's rights.

222.    As a result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Solorio's rights were violated, and he suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

223.    The misconduct by all the Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the Defendant County of Los Angeles, which Solorio was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

### COUNT V – 42 U.S.C. § 1983
### *Monell* Claim

224.    Each paragraph of this Complaint is incorporated as if restated fully herein.

225.    Solorio's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of

the Defendant County of Los Angeles, as well as by the actions of its policy-making officials including the Supervising Defendants.

226.    At all times relevant to the events described in this complaint and for a period of time before and after, the Defendant County of Los Angeles failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of interrogations and questioning of criminal suspects and witnesses; the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses and suspects; the conduct of photo lineup and suspect identifications; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

227.    In addition or alternatively, the Defendant County of Los Angeles failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers of the LASD, with respect to the conduct of interrogations and techniques to be used when questioning criminal suspects and witnesses; the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; the conduct of photo lineup and suspect identifications; and the maintenance of

41

investigative files and disclosure of the files in criminal proceedings.

228.    Officers and agents of the Defendant County of Los Angeles committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

229.    Defendant County of Los Angeles was aware of the need for adequate policies, training, and supervision, were deliberately indifferent to the need, and made a deliberate choice not to adopt adequate policies, training, or supervision, all of which was an official policy.

230.    Had policymakers of the County of Los Angeles and the LASD promulgated appropriate policies, the violation of Solorio's constitutional rights would have been prevented.

231.    In addition, at all times relevant to the events described in this complaint and for a period of time before, Defendant County of Los Angeles had notice of practices and customs of officers and agents of the LASD that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative or other materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses, including by feeding facts, issuing undisclosed threats, and manipulating witnesses; (3) officers failed to maintain and/or preserve material evidence and/or destroyed evidence, including physical evidence; (4) officers conducted improper and suggestive lineups designed to elicit identifications of suspects without regard for whether those identifications were accurate; and/or (5) officers pursued wrongful convictions through profoundly flawed investigations.

232.     These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the County of Los Angeles and the LASD directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees; by failing to adequately punish and discipline prior instances of similar misconduct; and by maintaining a code of silence pursuant to which officers were encouraged not to rat one another out, thus directly encouraging future abuses like those affecting Solorio.

233.     The above practices and customs were so well settled as to constitute de facto policies of the County of Los Angeles and the LASD. The practices and customs were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it, even though it was foreseeable that such practices and customs would result in wrongful convictions such as Solorio's.

234.     Within the County of Los Angeles and the LASD, a culture of impunity, a code of silence, and a failure to discipline and supervise allowed widespread misconduct to go unchecked, as described more fully above.

235.     The fact that the misconduct described in this complaint during the Bramlett homicide investigation was carried out openly and conspiratorially amongst numerous officers, including experienced homicide detectives, reflects the widespread, pervasive nature of the misconduct in the LASD at times relevant to the events described in this complaint.

236.     In addition, or in the alternative, the misconduct described in this

count was undertaken pursuant to the Defendant County of Los Angeles's policies and practices in that the constitutional violations committed against Solorio were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the County of Los Angeles and the LASD, or were actually committed by persons with such final policymaking authority including Supervising Defendants.

237.   The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and caused Solorio to suffer the grievous and permanent injuries and damages set forth above.

238.   Solorio's injuries were caused by officers, agents, and employees of the Defendant County of Los Angeles, including but not limited to the Officer Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

239.   As a result of the Defendant County of Los Angeles's policies, practices, and customs, Solorio suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

WHEREFORE, Plaintiff MIGUEL SOLORIO, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the Officer Defendants, as well as any other relief this Court deems appropriate including but not limited to injunctive or other non-monetary equitable relief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JURY DEMAND**

Plaintiff, MIGUEL SOLORIO, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**MIGUEL SOLORIO**

BY:   /s/ David B. Owens

*One of Plaintiff's attorneys*

David B. Owens (SBN 275030)
LOEVY & LOEVY
333 S. Grand, Suite 3310
Los Angeles, CA 90071

Jon Loevy, IL Bar: 6218254*
Isaac Green, IL Bar No. 6350515*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

*Counsel for Plaintiff*

*Pro hac vice admission forthcoming